### THE H. B. MOORE, JR.

#### DALZELL v. WATT.

##### (District Court, E. D. New York. May 12, 1902.)

COLLISION—INSUFFICIENT MOORING—NEGLIGENCE OF MASTER.

 A waterboat made fast to the outer side of a yacht moored in a rather exposed position in North river for the purpose of supplying her with water. The vessels were headed toward the north, and the waterboat was secured by head, breast, and stern lines, which were of sufficient strength for ordinary occasions; but there was a northwest wind, the river was filled with floating ice, and an ebb tide was setting in, which made the boat's position one of more than ordinary danger. The master and steward both went on board the yacht while the water was being discharged, leaving no one on board the yacht while the water was of the vessel. While there a large quantity of ice came against the stem, the lines parted, and before the master could go on board and get her in forward motion she drifted astern and injured the yacht's tender, suspended outboard. *Held*, that under the circumstances the master was negligent in leaving the vessel, and that she was liable for the injury done.

In Admiralty. Suit for collision and cross libel for supplies furnished.

Wilcox & Green, for Watt.

James J. Macklin, for Dalzell and the H. B. Moore, Jr.

THOMAS, District Judge. The yacht America, 254 feet in length, was on January 5, 1899, lying in the North river at the bulkhead off 136th and 137th streets, with the pier at 135th street some 200 feet astern, but with no pier to the northward and ahead of her, except a small pier about 60 or 80 feet in length at 136th street. The locality was not much frequented by ships. Between 6 and 7 o'clock in the evening the waterboat H. B. Moore, some 65 feet in length, came to supply the yacht with water, and made fast alongside the outer and port side, heading up the river. The stem of the Moore was from 20 to 25 feet abaft the stem of the yacht, and was moored to the yacht by head, breast, and stern lines. Some 20 minutes after the Moore had been made fast, and while the water was being supplied to the yacht, the headline parted. This was followed by a part-

ing of the breast and stern lines as the Moore went astern; whereupon the aft end of the house of the waterboat carried away the yacht's launch, suspended from davits, about 5 feet outboard, and 150 or 160 feet aft of the stem. For the injury thus done the owner of the yacht has libeled the Moore. The owner of the Moore has libeled the yacht for water supplied on several occasions. Those on the yacht made the line fast. It was dark at the time, but there were electric lights around the house on the deck of the yacht. The wind was somewhat west of north. When the Moore was made fast it was slack water, and about the beginning of the ebb.

The two faults against the Moore will be considered: First, that she was not made fast by sufficiently strong lines; second, that the captain of the Moore left his vessel and went upon the yacht, leaving no person in proper charge of his tug. Mr. Watt was living upon his yacht. He testified that after the headline had been made fast he said to the captain of the Moore, "Captain, I think your line is very light. You have got quite an ebb tide and a good deal of ice here in the river. He says, 'Well, I think that will hold her.' I said, 'All right, you are boss of the job,' or some such word, and I went below." Dunn, chief officer of the yacht, testified that Mr. Watt said to the person in the pilot house of the Moore that he "didn't consider the lines were sufficient to hold the boat," and that the person addressed replied "it was a brand new three-inch line," and that the reference was to the headline. Dunn also testified that the head and breast lines had the appearance of being "a secondhand rope,—a rope that had been used for quite some time." Mr. Watt testified of the headline, "It looked like a line that had been weather beaten," and that the part on the tug looked as if "it had been chafed around the bitt." Hanson, a seaman on the yacht, testified that the line was old and chafed. The evidence of the captain of the tug was that the head and breast lines were new, having been in use but a few days, and that the sternline, although not new, was a good line. The engineer also testified that the headline was a new line, and Mr. Dalzell, owner of the Moore, testified that on December 29th there had been placed at the ship chandler's to the credit of the Moore seventeen fathoms of 5-inch manilla, and 15 fathoms of 4⅛-inch manilla, and produced the book showing such facts. It is concluded from this evidence that for ordinary purposes the lines were sufficiently strong, but it remains to be considered whether in the employment of such lines the Moore discharged its duty under the circumstances.

As has been stated, the wind was west of north, blowing upon the bow of the Moore. Although she was made fast in slack water, it was the very beginning of the ebb, and the tide shortly began to set strongly upon the Moore. The ice was in such quantity and condition in the river that the Moore had difficulty in making her way to her position alongside the yacht, and her captain knew that the ebb tide was at hand, and that it would shortly set upon his vessel. As to this he testified:

"Q. What is the character of the first of the ebb in there? A. It sets in there on the bulkhead strong. After the tide gets running fair down the river, it slackens up alongside of the docks."

Concerning the condition of the ice he testified:

"Q. You had been there about 15 or 20 minutes, and this large quantity of ice came there? A. Yes, sir; a large floe. Q. Describe that a little more to me; was it one great big piece or a whole lot of it? A. A whole lot of it coming down,—great big chunks of drifting ice. Q. During the 20 minutes you had been there had there been any other floes like that that struck your boat? A. No, sir; there was plenty of ice in there, but owing to the slack water it was not moving any. Q. Do I understand you this was the first ice that came against your boat? A. That is the first that came against her with any force; yes, sir. Of course, we had to buck through it to get to the yacht. Q. When you got in there, and were lying alongside of the yacht, describe how the ice acted upon your boat, if at all? A. It came right down; seemed to set right in there and hit our bow. Q. I mean before the ice came that made the accident? A. That was the very first set of the tide in there. Q. Before that had any pieces of ice struck against your boat? A. Only what we made by running through it ourselves. Q. I mean after you were made fast did any come down and hit your boat? A. When the ebb tide made; yes. Q. I mean before the ice that carried you away? A. No, sir; it didn't have any effect on the boat till the tide started to run. It was perfectly clear in there on account of the tide being slack.—the last of the tide water. There was plenty of ice there, but it hadn't got running yet. Q. When this piece of ice struck you did it hit the stem of your boat or go in between you and the yacht? A. There was so much of it it hit our stem, and went in between us, too, at the same time. Q. Was it of great force? A. Oh, yes, sir."

The condition of the ice, and the capacity of the lines in view of such condition, are illustrated by the following evidence, given by the captain of the Moore:

"Q. How much contact as to violence? A. She hit a pretty good blow,— the weight of all that ice and tide. Q. Was the ice rolled one piece on top of another? A. Yes; it came down, tons of it. Q. At that time if you had other lines out would you have held? A. I don't think anything could hold her; no, sir. Q. You say as the ebb tide continues it dies out there? A. Yes; till its gets running fair in the middle of the river, then it eases up along the bulkhead. Q. The first of the ebb runs right in there, does it? A. Yes, sir; it does. Q. Why would nothing have held that boat? A. On account of the pressure of the ice."

Under these conditions, what did the captain of the Moore do for the preservation of his vessel, and what should he have done? When the Moore was made fast, the captain and steward went aboard the yacht and remained there, although it was not apparent that any duty called either of them to that place. The three remaining members of the crew were on the deck, the fireman in his proper position, the engineer in attendance upon the pumps, the deck hand on the tug, but where does not appear. As to him the captain of the Moore testified:

"The mate was aboard the boat. Q. Where was he? A. I don't know exactly; I think he was down forward somewhere by the line. * * * Q. Who was in the pilot house? A. Nobody; we have a bell pull on the after end of the house. Q. Then while you were alongside the pilot house had no captain at all? A. No, sir."

The captain of the Moore further testified:

"We heard the lines snap, and I jumped aboard the boat. I ran aft to the after bell pull, rang one bell to go ahead slow, then two quick bells to hook up ahead in the head motion, which is customary, because we don't have a jingle bell or hook up bell on the after part of the house. Q. At that time had the bowline parted or not? A. The bowline had parted; yes, sir."

The facts thus ascertained show that the Moore with difficulty approached the yacht through the ice; that the three lines were put out; that an ebb tide, setting against the bow, was approaching; that the northerly wind was blowing against her bow; that the captain and steward of the Moore left the vessel; that no one was in the pilot house; that no one was on lookout for the ice; that this great quantity of ice was allowed to come upon and collide with the Moore without being discovered by anybody; that the master of the tug had not time to reach even the bell at the after end of the house, and much less the pilot house itself, before the line snapped; that he did not even leave the yacht until the line had parted; and that, before he could get in forward motion, the Moore was permitted to go astern the considerable distance necessary to carry away the launch before anything was done or could be done. It is considered that these facts furnish evidence of grave fault on the part of the tug, and that the owner of the launch should have a decree for the injuries thereto arising from such fault. The owner of the Moore will have a decree for the amount due him for water supplied.